**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **RACINE WILLIAMS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LINEAGE LOGISTICS, LLC,**<br>Serve at:<br>Corporation Service Company<br>2900 SW Wanamaker Drive, Ste. 204<br>Topeka, Kansas 66614<br><br>**Defendants.** | **JURY TRIAL DEMANDED**<br><br>**Civ. No.: ____________________** |

## COMPLAINT

COMES NOW Plaintiff, Racine Williams, by and through his attorneys, for his cause of action against Lineage Logistics, LLC ("Lineage"), states as follows:

### Parties

1. Plaintiff is a citizen of the United States and currently resides in Gladstone, Missouri.

2. Within the meaning of Title VII, 42 U.S.C. §2000e, Plaintiff was an "employee" during all times relevant to this Complaint.

3. Defendant Lineage Logistics, LLC is a company authorized and doing business in the State of Kansas. Defendant Lineage's headquarters is located at 46500 Humboldt Dr., Novi, Michigan 48377.

4. Plaintiff worked for Defendant at its Edwardsville, Kansas location from approximately April 3, 2017, to approximately December 27, 2017.

5. Lineage is an "employer" within the meaning of Title VII because at all relevant

times, Lineage employed more than fifteen employees in an industry affecting commerce.

6. Defendant Lineage's employees, supervisors, and agents, at all times herein relevant, acted on Lineage's behalf, as Lineage's agent, with actual or apparent authority, and/or Defendant Lineage approved, condoned, or ratified their conduct.

**Jurisdiction and Venue**

7. This Court has subject matter jurisdiction over this controversy under 28 U.S.C. § 1331, because it involves claims that arise under federal statutes, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16 *et seq.* as amended, and 42 U.S.C. § 1981.

8. This Court has personal jurisdiction over Defendant Lineage because Defendant maintains minimum contacts within the state of Kansas by owning and managing a facility in Edwardsville, Kansas, in Wyandotte County, which lies within the United States District of Kansas.

9. Under 28 U.S.C. 1391(b), venue is proper in this Court because Defendant owns and/or manages a facility in Wyandotte County, Kansas, which lies within the District of Kansas. Further, venue is proper in this Court because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district, Plaintiff was employed by Defendant within this judicial district, and Defendant's violations occurred within this judicial district.

**Administrative Procedures**

10. On or about June 8, 2018, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") against Defendant Lineage on the basis of race discrimination and retaliation. *See* ***Charge of Discrimination***, Ex. A.

11. On or about May 14, 2019, the EEOC issued to Plaintiff his Notice of Right to Sue. Plaintiff received the Notice of Right to Sue on or about May 16, 2019. This lawsuit was filed

within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue, which entitles Plaintiff to commence an action regarding his claims. *See* ***Notice of Right to Sue***, Ex. B.

12. The aforementioned Charges of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties. Accordingly, the scope of this Complaint may be, and is, as broad as the scope of an EEOC investigation that could have been reasonably expected to grow out of the Charge of Discrimination.

13. Accordingly, Plaintiff has satisfied all private, administrative, and judicial prerequisites to the commencement of this action.

## General Allegations Common to All Counts

14. The preceding paragraphs are fully incorporated as though fully set forth herein.

15. Plaintiff is an African-American male.

16. Defendant employed Plaintiff from approximately April 3, 2017 to December 27, 2017.

17. Plaintiff worked as a Building Maintenance Technician at the facility located at 2350 S. 98th St., Suite A, Edwardsville, Kansas 66111.

18. Throughout his employment with Lineage, Plaintiff successfully performed the requirements of his job and was a dedicated and valuable employee.

19. Plaintiff's supervisor at the time of his hire was Troy Stewart, Maintenance Manager.

20. When he first started working for Defendant, Plaintiff was paid $20 per hour plus incentive bonuses. Incentive bonuses were earned based on factors such as attendance and a lack of injuries.

21. Plaintiff was initially placed on a 90-day probationary period, which he completed

without incident.

22. On September 4, 2017, Lineage assigned a new Maintenance Manager, Lonny Delvecchio, to work as Plaintiff's supervisor.

23. Shortly after Mr. Delvecchio became Maintenance Manager, Plaintiff heard rumors that he and Mr. Japheth Warner would be promoted to Lead Maintenance Technicians, known as "Leads."

24. Plaintiff heard that he and Mr. Warner were selected for the promotions because they were "black alpha-males" and that they would "save the company from future lawsuits."

25. In October of 2017, Troy Stewart told Mr. Warner that Lineage wanted Plaintiff and Mr. Warner to become Leads. Mr. Stewart told Plaintiff and Mr. Warner that he'd "rather have two other guys, but we'll start with you." Mr. Stewart told Mr. Warner that maintenance was not being completed and that Lineage wanted "a couple of scary black guys (Plaintiff and Mr. Warner) to be enforcers."

26. On November 8, 2017, Plaintiff and Mr. Warner, received their "Promotions" (Mr. Warner asserts that he had already been promoted to this position) from Troy Stewart and were told that their promotions were subject to a 90-day probationary period. They were told they would receive no raises until they completed the 90-day period. They were given red vests to denote their new status as Leads.

27. Following their promotions to Leads, Lonny Delvecchio began relying upon the two of them to carry out his day-to-day instructions, rather than giving the two men specific authority.

28. Plaintiff later asked his coworkers if it was standard to be placed on a 90-day probation after receiving a promotion. Plaintiff was told that no one else had ever heard of such a

thing happening and it was normal for the newly promoted employees to be given immediate raises and specific duties.

29. Plaintiff and Mr. Warner were the first African-American employees to receive a promotion to Lead and there were no African-Americans in Lead or Management positions in the maintenance department. Plaintiff knows of only one African-American in a leadership position at the Edwardsville branch of Lineage.

30. Plaintiff's first negative interaction as a lead happened after Lonny Delvecchio changed an employee's (John Woods) schedule at the employee's request. Plaintiff told Mr. Delvecchio that this change was problematic as it caused a gap in coverage for the "floor." After confirming with Mr. Delvecchio that this would not work, Plaintiff sent a text to Mr. Woods and explained that he would need to resume his old schedule. Mr. Woods did not like this and texted back to Plaintiff, "[w]e'll see about that, asshole." Mr. Delvecchio saw this and reported the interaction to human resources.

31. On November 15, 2017, Plaintiff and Mr. Woods were called into a meeting with Steven Debeau, Human Relations Manager. At this meeting, Mr. Debeau told Plaintiff that he and Mr. Woods were being given "two-day final-warning suspensions." Mr. Debeau told Plaintiff that his suspension was for calling Mr. Woods an "asshole" at some point in the past, prior to his promotion to Lead. Mr. Debeau said that this discipline was necessary because Plaintiff was now a Lead and was to be held to a higher standard. Plaintiff strongly objected to the unfairness of this, that he was being judged as a Lead for actions prior to his promotion. He was suspended for the following two days.

32. Following his suspension, Plaintiff sent an email to Steven Debeau listing his complaints about the promotions including the lack of a raise, the probationary period, and his

suspension for something that occurred prior to his promotion. Plaintiff asked for a meeting to address these concerns.

33. Mr. Debeau responded on November 17, 2017 and told Plaintiff that his suspension had expired that day and that he could return to work. Even though Mr. Debeau told Plaintiff that he and John Woods had received the same suspension, Mr. Woods had been allowed to return to work that day. Mr. Debeau promised to credit Plaintiff for whatever hours he had missed that morning.

34. In his response to Plaintiff, Mr. Debeau also told Plaintiff that he and Mr. Warner would receive an extra dollar per hour in their incentive pay for their promotions, rather than an increase in their hourly rate. However, Mr. Debeau told Plaintiff verbally that after the 90-day probationary period he and Mr. Warner would receive raises to their hourly rates. Mr. Debeau also told Plaintiff that he would have to speak to Lonny Delvecchio about the probationary period and that a probationary period for promotion to a lead position was "unheard of." Mr. Debeau informed Mr. Warner during a meeting that Plaintiff and Mr. Warner should have received the extra dollar per hour of incentive pay at the time of their promotions.

35. On December 3, 2017, Plaintiff was ordered to work in an unsafe manner while working with railroad cars. He was told by Robb Mowery that a railcar door should "be opened with a 'piece of equipment' and 'C-clamped' to be held open because Union Pacific spotted the refer [sic] cars there instead of the correct doors." Plaintiff told the operations manager that this was dangerous, as it could cause the door to fall suddenly, which it subsequently did. Plaintiff also told Mr. Mowery that this was not safe and that it should have taken three operators to carry out this task, but Mr. Mowery did "not want to hear about that, he just wanted the job done."

36. Later that day, December 3, 2017, Plaintiff sent an email to Troy Stewart, Lonny

Delvecchio, Dale Slaughter, and Mr. Warner describing his safety concerns regarding the railcar door as well as other tasks he had been asked to carry out that he felt violated safety precautions. In this email Plaintiff also again questioned his treatment with respect to his promotion; why he and Mr. Warner were put on probation for the position when other workers were promoted without probationary periods.

37. Plaintiff began experiencing stress and anxiety about job safety and how he was being treated. He sent an email the morning of December 8, 2017, reporting that he was unable to work that day due to sickness.

38. Plaintiff sent another email later in the day on December 8, 2017, inquiring about the state of his and Mr. Warner's promotions and asking why the two of them had never received their promised pay increases. Plaintiff also reported that he was stressed, aggravated, and that his morale was at a low point. Plaintiff stated that he felt that he and Mr. Warner were "used as pawns." Plaintiff again requested a meeting to gain some clarity on the situation.

39. Plaintiff and Mr. Warner met with Robb Mowery, Lonny Delvecchio, and Steven Debeau on December 12, 2017. In this meeting, each of Plaintiff's and Mr. Warner's supervisors claimed they had no idea about the promotions, probationary or otherwise, even though Mr. Williams and Mr. Warner had been wearing the red vests that corresponded to their Lead roles, their schedules had been changed to coincide with their positions, and there had been numerous written and oral communications about these promotions.

40. During the December 12, 2017 meeting, Plaintiff and Mr. Warner both told Robb Mowery that they were not interested in the promotions because they believed they were not being treated similarly to Caucasian employees who had received promotions without a probationary period. Plaintiff then specifically asked "[w]hy aren't Caucasian employees in our department put

on probation for lead positions?" At this point, Mr. Mowery responded, asking "Racine, you realize this is a right to work state?" Plaintiff and Mr. Warner were then told they had until December 15, 2017 to either accept the Lead position with the probationary period or to not receive the promotion at all. Plaintiff replied that he was turning down the promotion as long as it included probation because he felt he and Mr. Warner were not being treated fairly.

41. Later in the day on December 12, 2017, Plaintiff sent an email to Steven Debeau listing a number of concerns he had about the earlier meeting. Plaintiff also wrote that he was experiencing a large amount of stress due to the above situation, and that "getting up in the morning heading to work gives me anxiety," and that it makes it hard for him to carry out his job duties. He also wrote that he "felt bullied" due to Robb Mowery's statement that this "is a right to work state." He closed the email by writing that he just wanted to be treated fairly.

42. On December 13, 2017, Mr. Debeau sent Plaintiff a reply suggesting possible meeting times.

43. The morning of December 13, 2017, Plaintiff was called into Lonny Delvecchio's office. Mr. Delvecchio seemed angry and began interrogating Plaintiff about the workload, other employees' whereabouts, and generally acting as if Plaintiff still held the Lead position.

44. Later that same day at the end of his shift, Plaintiff was preparing to clock out when Lonny Delvecchio drove up in his truck and again began screaming and cursing at Plaintiff. Mr. Delvecchio followed Plaintiff as he was attempting to leave, still yelling at him despite Plaintiff asking him to stop and leave him alone. Finally, Mr. Delvecchio stopped yelling, though at this point he began stating repeatedly, "I'll show you alright" and "Just you wait" and "We'll see about this." A number of co-workers witnessed this interaction. Plaintiff was embarrassed and humiliated and suffered an anxiety attack when he got to his car.

45. On December 14, 2017, as a result of the anxiety Plaintiff was experiencing at work, he called in sick and was forced to begin utilizing his accumulated vacation time. Plaintiff began experiencing anxiety attacks at the thought of going to work. He continued to stay in contact with Steven Debeau from Human Resources and even attempted to reach out to Lonny Delvecchio about the situation, though he received no reply. Plaintiff returned to work on December 21, 2017.

46. Steven Debeau arranged a meeting between Mr. Williams and Lonny Delvecchio on December 20, 2017, to attempt to resolve the problems between the men. During the meeting, Mr. Delvecchio seemed unresponsive to any resolution and Plaintiff believed that Mr. Delvecchio was going to try to provoke a situation in an attempt to get him terminated. After the meeting, Mr. Debeau told Plaintiff "there is no reason for something like that to happen or for a member of management (Mr. Delvecchio) to act like that." He also said Mr. Delvecchio was "acting like a 2-year-old who didn't get his way at Walmart." Plaintiff left the meeting anxious about his future with the company.

47. On December 24, 2017, Mr. Williams reported for work. Lonny Delvecchio attempted to send him home immediately, stating "I don't need you so just go home," but Mr. Warner talked Mr. Delvecchio into allowing Plaintiff to stay. Plaintiff then began carrying out his duties. Because it was Christmas Eve, there was less work than usual.

48. Around noon on December 24, 2017, Plaintiff and Mr. Warner clocked out for lunch. Right before lunch they were told the plant would be closing at 2:00 pm because of the holiday. After Plaintiff and Mr. Warner clocked back in from lunch, Plaintiff spent some time checking on "downed doors." Plaintiff also left for 15 minutes with Mr. Warner to run to a convenience store.

49. On December 27, 2017, Steven Debeau called Plaintiff and told him that he was

fired for “stealing time.” Mr. Debeau said that they saw his car leave for two hours during work on December 24, 2017. Mr. Warner was fired as well. Plaintiff maintains that he only left for fifteen minutes on December 24, 2017.

50. Significantly, three other non-African American employees were disciplined, but not terminated, on December 27, 2017, for going to a bar for several hours on company time on December 23, 2017. One of the employees who left to go to the bar was John Woods, who had previously been warned about such behavior and had already received a two-day suspension and final warning. One of the other employees, Austin Woods, had previously been caught leaving the premises on company time and was allegedly already slated for termination prior to being caught; however, he was permitted to continue working for an additional several weeks to a month before he was finally terminated for sleeping on the job. Plaintiff and Mr. Warner were the only employees fired on December 27, 2017, for “stealing time.”

**COUNT I**
**Title VII – Unlawful Discrimination on the Basis of Race**

51. The above paragraphs are incorporated and re-alleged as though fully set forth herein.

52. Plaintiff is an African-American who was employed by Defendant. By virtue of his race, Plaintiff is a member of a class of persons protected by Title VII.

53. Defendant discriminated against Plaintiff in the terms and conditions of his employment on the basis of his protected group status (African-American), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* as amended.

54. Defendant subjected Plaintiff to disparate treatment because of his race by conditioning Plaintiff’s promotion to a lead position on a 90-day probationary period, unlike others promoted to a lead position, and refusing Plaintiff a raise in his hourly rate offered to others at the

time of their promotions.

55. Defendant further subjected Plaintiff to disparate treatment because of his race by subjecting Plaintiff to unwelcome harassment and terminating Plaintiff's employment with Defendant.

56. Defendant knew or should have known of the harassment and disparate treatment and failed to take appropriate action to prevent such discrimination.

57. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff was deprived of income, as well as other benefits, monetary and non-monetary.

58. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered humiliation, damage to his self-esteem, emotional distress, mental anguish, and related compensable damage.

59. Defendant failed to make good faith efforts to establish and to enforce policies that would prevent unlawful discrimination against its employees, including discrimination on the basis of race.

60. Defendant failed to properly train and/or otherwise inform its supervisors and employees of their duties and obligations under applicable civil rights laws, including Title VII.

61. Through Defendant's failure to take prompt and effective remedial action, in effect, Defendant condoned, ratified, and/or authorized the discrimination and harassment against Plaintiff.

62. Defendant's conduct was willful, wanton, malicious, and showed a complete indifference to or conscious disregard for the rights of others, including Plaintiff's rights. Thus, an award of punitive damages is warranted in an amount that is sufficient to punish or to deter Defendant and others from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant for such damages, actual, nominal, and punitive as are fair and reasonable; for his reasonable attorneys' fees and costs incurred herein; for interest as allowed by law, both pre-judgment and post-judgment; and for such other legal and equitable relief as the Court deems just and proper.

## <u>COUNT II</u>
## Title VII – Unlawful Retaliation

63. The above paragraphs are hereby incorporated by reference as though fully set forth herein.

64. In violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16 *et seq.* as amended, Defendant retaliated against Plaintiff by treating Plaintiff in a manner designed to discourage the opposition of discriminatory conduct. Defendant retaliated against Plaintiff as a direct result of his opposition to unlawful practices and complaining about discrimination on the basis of race. Ultimately, Defendant terminated Plaintiff's employment in retaliation for his opposition to discrimination.

65. While Plaintiff was working for Defendant, he participated in the statutorily protected activity of opposing discriminatory practices, by complaining to Defendant about discrimination and disparate treatment based on his membership in a protected class. Therefore, Plaintiff was a covered individual.

66. Defendant became aware of Plaintiff's opposition to the unlawful discrimination when Plaintiff complained to Human Resources and management both orally and in writing. As such, Defendant was aware of Plaintiff's opposition to illegal practices.

67. After Plaintiff engaged in such statutorily protected activity, Defendant retaliated

against him for exercising his protected rights by terminating Plaintiff's employment.

68. As a direct and proximate result of Defendant's actions and/or inaction, Defendant deprived Plaintiff of income as well as other monetary and non-monetary benefits.

69. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, and related compensable damage.

70. Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damage as a result of Defendant's retaliatory practices unless and until the Court grants him relief.

71. Defendant failed to make good faith efforts to establish and to enforce policies to prevent illegal discrimination and retaliation against its employees, including retaliation for making complaints of discrimination.

72. Defendant failed to properly train and/or otherwise inform its supervisors and employees of their duties and obligations under applicable civil rights laws, including Title VII.

73. Through its failure to take prompt and effective remedial action, in effect, Defendant condoned, ratified, and/or authorized the discrimination, harassment, and retaliation against Plaintiff.

74. Defendant's conduct was willful, wanton, malicious, and showed a complete indifference to or conscious disregard for the rights of others, including Plaintiff's rights. Thus, an award of punitive damages in an amount sufficient to punish Defendant or to deter Defendant and others from like conduct in the future is warranted.

75. Plaintiff is entitled to recover reasonable attorneys' fees and court costs from Defendant.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant for such damages, actual, nominal, and punitive as are fair and reasonable; for his reasonable attorneys' fees and costs incurred herein; for interest as allowed by law, both pre-judgment and post-judgment; and for such other and further legal and equitable relief as the Court deems just and proper.

**COUNT III**
**42 U.S.C. § 1981 – Unlawful Discrimination on the Basis of Race**

76. The above paragraphs are hereby incorporated by reference as though fully set forth herein.

77. Plaintiff is an African-American and was employed by Defendant. By virtue of his race, Plaintiff is a member of a class of persons protected by 42 U.S.C. § 1981.

78. In violation of § 1981, on the basis of his race (African-American), Defendant discriminated against Plaintiff in his right to make and enforce contracts, and to enjoy all benefits, privileges, terms, and conditions of that contractual relationship.

79. Defendant subjected Plaintiff to unlawful discrimination that affected a term, condition, and/or privilege of his employment contract with Defendants.

80. Plaintiff's working environment was permeated with discriminatory harassment and he was subjected to disparate treatment when he was denied the same privileges of employment and when Defendant terminated his employment. Those subjecting Plaintiff to the disparate treatment included his co-workers, his supervisors, and upper management.

81. Defendant knew or should have known of the disparate treatment and discrimination and failed to take appropriate action to prevent it.

82. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff

was deprived of income, as well as other benefits, monetary and non-monetary.

83. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff has suffered humiliation, damage to his self-esteem, emotional distress, mental anguish, and related compensable damage.

84. Defendant failed to make good faith efforts to establish and to enforce policies that would prevent unlawful discrimination against its employees, including discrimination on the basis of race.

85. Defendant failed to properly train and/or otherwise inform its supervisors and employees of their duties and obligations under applicable civil rights laws, including § 1981.

86. Through its failure to take prompt and effective remedial action, in effect, Defendant condoned, ratified, and/or authorized the discrimination and harassment against Plaintiff.

87. Defendant's conduct was willful, wanton, malicious, and showed a complete indifference to or conscious disregard for the rights of others, including Plaintiff's rights. Thus, an award of punitive damages is warranted in an amount that is sufficient to punish Defendant or to deter Defendant and others from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant for such damages, actual, nominal, and punitive as are fair and reasonable; for his reasonable attorneys' fees and costs incurred herein; for interest as allowed by law, both pre-judgment and post-judgment; and for such other legal and equitable relief as the Court deems just and proper.

## COUNT IV
## 42 U.S.C. § 1981 – Unlawful Retaliation

88. The above paragraphs are hereby incorporated by reference as though fully set forth

herein.

89. In violation of §1981, Defendant retaliated against Plaintiff by treating Plaintiff in a manner designed to discourage the participation in opposition of discriminatory conduct. Defendant's retaliation against Plaintiff was a direct result of Plaintiff's opposition to unlawful practices on the basis of race. Ultimately, Defendant terminated Plaintiff's employment in retaliation to his opposition to discrimination.

90. While Plaintiff was working for Defendant, he participated in the statutorily protected activity of opposing discriminatory practice.

91. Defendant became aware of Plaintiff's opposition to the unlawful discrimination when Plaintiff complained to Human Resources and management both orally and in writing via email. As such, Defendant was aware of Plaintiff's opposition to illegal practices.

92. After Plaintiff engaged in such statutorily protected activity, Defendant retaliated against him for exercising his protected rights by terminating Plaintiff's employment.

93. As a direct and proximate result of Defendant's actions and/or inaction, Defendant deprived Plaintiff of income as well as other monetary and non-monetary benefits.

94. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, and related compensable damage.

95. Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damage as a result of Defendant's retaliatory practices unless and until the Court grants him relief.

96. Defendant failed to make good faith efforts to establish and to enforce policies to prevent illegal discrimination against its employees, including retaliation for making complaints

of discrimination.

97. Defendant failed to properly train and/or otherwise inform their supervisors and employees of their duties and obligations under applicable civil rights laws, including § 1981.

98. Through its failure to take prompt and effective remedial action, in effect, Defendant condoned, ratified, and/or authorized the discrimination and harassment against Plaintiff.

99. Defendant's conduct was willful, wanton, malicious, and showed a complete indifference to or conscious disregard for the rights of others, including Plaintiff's rights. Thus, an award of punitive damages in an amount sufficient to punish Defendant or to deter Defendant and others from like conduct in the future is warranted.

100. Plaintiff is entitled to recover reasonable attorneys' fees and court costs from Defendant.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant for such damages, actual, nominal, and punitive as are fair and reasonable; for his reasonable attorneys' fees and costs incurred herein; for interest as allowed by law, both pre-judgment and post-judgment; and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT V
## Wrongful Discharge in Violation of Public Policy

101. The above paragraphs are hereby incorporated by reference as though fully set forth herein.

102. As demonstrated above, during his employment with Defendant, Plaintiff reported safety violations to management of Lineage.

103. Because Plaintiff reported his concerns directly to management via email on December 3, 2017, Defendant had knowledge that Plaintiff had reported these violations.

104. After Plaintiff reported these safety violations, Defendant retaliated against him by taking adverse action against him. Specifically, but not-hereby limited, Defendant terminated Plaintiff's employment on December 27, 2017.

105. A causal connection exists between the protected activity of reporting violations to management and the termination of Plaintiff's employment.

106. The stated reason for Plaintiff's termination was false and pretextual.

107. As a direct and proximate result of Defendant's actions and/or inaction, Defendant deprived Plaintiff of income as well as other monetary and non-monetary benefits.

108. As a direct and proximate result of Defendant's actions and/or inaction, Plaintiff suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, and related compensable damage.

109. Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damage as a result of Defendant's retaliatory practices unless and until the Court grants him relief.

110. Through its failure to take prompt and effective remedial action, in effect, Defendant condoned, ratified, and/or authorized the retaliatory actions against Plaintiff.

111. Defendant's conduct was willful, wanton, malicious, and showed a complete indifference to or conscious disregard for the rights of others, including Plaintiff's rights. Thus, an award of punitive damages in an amount sufficient to punish Defendant or to deter Defendant and others from like conduct in the future is warranted.

112. Defendant's actions have directly and proximately caused Plaintiff substantial economic loss, humiliation, mental stress, anxiety, pain and suffering.

**WHEREFORE**, Plaintiff prays for relief as follows:

Plaintiff requests that the Court enter judgment in his favor and against Defendant for such damages, actual, nominal, and punitive as are fair and reasonable; for his reasonable attorneys' fees and costs incurred herein; for interest as allowed by law, both pre-judgment and post-judgment; and for such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all counts of his Complaint triable to a jury.

## Designation of Place of Trial

Plaintiff hereby designates Kansas City, Kansas, as the place of trial.

Dated: August 9, 2019

Respectfully submitted,

s/ Kathryn Rickley
Kathryn S. Rickley, KS # 23211
Matthew E. Osman, KS # 23563
OSMAN & SMAY LLP
8500 W. 110th St., Suite 100
Overland Park, KS 66210
1-913-667-9243 (Phone)
1-866-470-9243 (Fax)
krickley@workerwagerights.com
mosman@workerwagerights.com
**ATTORNEYS FOR PLAINTIFF**